UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**CAMERON HESS,**<br><br>       **Defendant.** | Case No. 23-cr-00086 (RCL) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Cameron Hess to 12 months of incarceration, 2 years of supervised release, $2,000 in restitution, and a $100 mandatory assessment. This sentence falls in the middle of Hess' Sentencing Guidelines range of 8-14 months and balances the factors articulated in 18 U.S.C. § 3553.

I.    **INTRODUCTION**

Cameron Hess participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

1

Hess entered the U.S. Capitol by pushing with other rioters through the East Rotunda Doors. As police officers fired pepper balls and attempted to physically remove the rioters, Hess held his ground. The officers eventually removed Hess and the other rioters by pushing them back out the East Rotunda Doors. But as Metropolitan Police Officer E.C. attempted to close and secure the doors, Hess approached him and tried to prevent the doors from closing. Despite Officer E.C. telling him to "stop" multiple times, Hess pushed the officer with his right arm while holding the door open with his left arm.

On January 6, Hess sent text messages bragging about his physical clashes with police. He texted that "people [were] storming the Capitol" and that he was "in the thick of it. Got pepper sprayed and teargassed." Later that evening, Hess boasted that he had been "brawling at the door."

The government recommends that the Court sentence Hess to 12 months of incarceration for his conviction of violating 18 U.S.C. § 231(a)(3). A 12-month sentence reflects the gravity of Hess's conduct, but also acknowledges his early admission of guilt.

II.     FACTUAL BACKGROUND

   A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 34, for a short summary of the January 6, 2021 attack on the United States Capitol by

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      Cameron Hess's Role in the January 6, 2021 Attack on the Capitol**

Hess participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the MPD, open-source video, and surveillance footage from inside of the Capitol.

Hess traveled from Pennsylvania to support the former president on January 6, 2021. Hess crossed into the restricted area on Capitol Grounds and pushed himself into the Capitol building through the East Rotunda Doors at 3:24 p.m. *See* Image 1 below (Hess is circled in yellow in the doorway).



*Image 1 – Hess pushed into Capitol; pepper balls impacted wall left white marks*

3

Hess pushed his way inside at the same time that police officers were attempting to direct the rioters out of the doors. These officers can be seen at the bottom of Images 1 and 2. Throughout his attempts to push through the doors, Hess held his jacket up over his mouth and nose to help protect himself from pepper balls being fired by police. These pepper balls could be seen impacting the walls near the doorframe in this Capitol surveillance footage (impact marks circled in red). Sentencing Ex. 1.



*Image 2 – Hess pushed with the mob against a police line*

At 3:25 p.m., seen above in Image 2, Hess pushed further into the Capitol building, separated by just a few rioters from the line of police officers trying to clear rioters out of the building.

At 3:30 p.m., officers regained control of the doorway, and Hess was pushed back out through the East Rotunda Doors. Hess then approached the officers from the outside, shielding

4

his face with his jacket. In an attempt to breach the Capitol again, Hess pushed Officer E.C. who was trying to close the doors. *See* Image 3 below.



*Image 3 – Hess approached the doors alone and shielded his face*

Officer E.C. told Hess to "stop" multiple times, but Hess physically engaged the officer with his right arm while holding the door open with his left. *See* Images 4-5 below. Officer E.C.'s commands were captured in his body-worn camera. Sentencing Ex. 2.

5



*Image 4 – Hess pushed Officer E. C. while holding the door open*

After this confrontation, the police successfully closed the East Rotunda Doors, but Hess remained just outside the doors for at least ten more minutes. *See* Image 6 below.



*Image 5 – Hess outside after assaulting Officer E. C.*

On January 6, Hess sent text messages saying: "people storming the Capitol" and that he was "in the thick of it. Got pepper sprayed and teargassed." That evening he bragged about his assault on police, stating "I was brawling at the door." But several days later, Hess sent a message saying: "Don't tell anyone I was there."

### III.   THE CHARGES AND PLEA AGREEMENT

On March 10, 2023, a federal grand jury returned an indictment charging Cameron Hess with eight counts, including, civil disorder; assaulting, resisting, or impeding certain officers; entering and remaining in a restricted building or grounds; disorderly and disruptive conduct in a restricted building or grounds; engaging in physical violence in a restricted building or grounds; disorderly conduct in a Capitol building; act of physical violence in the Capitol Grounds or

Buildings; parading, demonstrating, or picketing in a Capitol building. On October 6, 2023, Hess was convicted of Count One, civil disorder, based on a guilty plea entered pursuant to a plea agreement.

### IV. STATUTORY PENALTIES

Hess now faces sentencing on Count One, civil disorder in violation of 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

### V. THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government does not object to the PSR's guidelines calculation:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---:|
| | U.S.S.G. § 2A2.4 Obstructing or Impeding Officers | 10 |
| | U.S.S.G. § 2A2.4(b)(1)(A) Physical Contact | +3 |
| | **Total** | **13** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-2</u> |
| **Total Adjusted Offense Level:** | | **11** |

The PSR did not address whether Hess qualifies for an offense level reduction under U.S.S.G. § 4C1.1. He does not because he used violence when he pushed Officer E.C. while

8

confronting him in the East Rotunda doorway. Other courts in the District have defined the "use of violence" as "[t]he use of physical force, typically 'accompanied by fury, vehemence, or outrage,' and 'unlawfully exercised with the intent to harm'" or as the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, 21-cr-386-2 (TNM), Mem. Op., ECF No. 195, at 4-5 (internal citations omitted); U.S.S.G. § 4C1.1(a)(3); *United States v. Hernandez*, 21-cr-445 (CKK), Mem. Op., ECF No. 65, at 5. Hess's violent contact is similar to Bauer's, who "shoved" an officer who was attempting to move her using his baton. *Bauer*, 21-cr-386-2, at 4. Importantly, Judge McFadden concluded that Bauer used violence even though she was not convicted of civil disorder or assault.

    Images 3-5 above capture Hess's attempt to breach the East Rotunda Door. He approached alone, while shielding his face from pepper spray, and used his right arm to push Officer E.C. while holding the Rotunda door open with his left arm. Though he had already been expelled by officers from the building once, Hess remained determined to "brawl" with officers and "storm" the Capitol. Sentencing Exhibits Two and Three, body-worn camera and CCTV videos, show this confrontation. Exhibit Six, a still image, clearly shows Hess's anger and determination as he assaulted the officer while fighting to keep the door open.

    This evidence proves that Hess used physical force "accompanied by fury, vehemence, or outrage" and "with the intent to harm . . . or abuse." *Bauer*, 21-cr-386-2 (TNM), ECF No. 195, at 4-5. Hess was indicted of assault under U.S.C. 111(a)(1) (Count Two) and plead guilty to civil disorder. He used violence against Officer E.C. and thus does not qualify for a reduction under U.S.S.G. § 4C1.1.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Hess's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Hess pushed into the Capitol, despite a line of officers attempting to clear the building. He used his jacket to shield his face from the effects of pepper balls being fired by the officers. After being removed, Hess attempted to breach the East Rotunda Doors again—this time alone. As Officer E.C. attempted to close the door, Hess pushed him with one arm and held the door open with the other. During this violent confrontation, Hess ignored the officer's commands to "stop." The nature and circumstances of Hess's offense was of the utmost seriousness, and fully support the government's recommended sentence of 12 months incarceration.

### B.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Hess's criminal conduct on January 6 was the epitome of disrespect for the law. The attack on the Capitol on January 6, 2021, struck at a core American principle. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our

10

democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### C. The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Hess should receive no leniency for any claim that he "merely followed" his friend to the Capitol on January 6. His friend was not present with him at the East Rotunda Doors. He did not lead Hess through the doors, nor encourage him to "brawl" with an officer to keep them open. Hess made these critical decisions on his own.

Although Hess may now express remorse and contrition, his statements immediately after January 6 were those of a man who was proud that he "brawled" with the police, proud to have put himself "in the thick of it" where he was "pepper sprayed and teargassed." In fact, before expressing any remorse whatsoever, Hess instead expressed a fear of getting caught ("Don't tell

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

11

anyone I was there"). *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Hess's sentence must be sufficient to provide specific deterrence from spearheading any more violent riots.

### D.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### E. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

13

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[4]

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This case is analogous to another civil disorder conviction sentencing by this Court. In *United States v. Nolan Cooke*, 22-cr-52 (RCL), the Court applied a final offense level of 11 and sentenced the defendant to 366 days incarceration. ECF No. 60, Judgement. Like Hess, Cooke physically confronted officers while attempting to propel the mob forward. *Cooke*, 22-cr-52 (RCL), ECF No. 52 at 6-33, Gov. Sent. Memo. While Cooke never entered the Capitol building, he did attempt to break a window with his flagpole. Though Cooke physically confronted officers multiple times, these confrontations were always in conjunction with others in the mob. Hess's assault is aggravated by the fact that he approached the officer alone—after he had been removed from the building and exposed to pepper ball deterrents.

The Court should treat these similarly situated defendants similarly and sentence Hess to the same term of incarceration—12 months, or 366 days.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer E.C., did not suffer bodily injury as a result of Hess's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Hess must pay $2,000 in restitution, which reflects in part the role Hess played in the riot on January 6.[6] Plea Agreement, ECF No. 32 at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 14, 2022. *Id.*; (the amount of damages has since been updated

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

by the Architect of the Capitol, USCP, and MPD.) Hess's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 118.

### VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 12 months of incarceration, 2 years of supervised release, $2,000 restitution, and a $100 mandatory assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:  */s/ Tighe R. Beach*
TIGHE R. BEACH
CO Bar No. 55328
Assistant United States Attorneys
601 D Street NW
Phone: (240) 278-4348
tighe.beach@usdoj.gov